# ELECTION PROTEST
(Use of this form is required by G.S. 163-182.9(c))

RECEIVED NOV 21 2016 STATE BOARD OF ELECTIONS

This form must be filed with the county board of elections within the timeframes set out in G.S. 163-182.9 (b)(4).

**1. Full name and mailing address of person filing the protest.**

Francis X. De Luca, registered voter in Wake County, North Carolina.

Mr. De Luca may be reached by mail via his attorney:
Josh Howard
Gammon, Howard & Zeszotarski, PLLC
115 ½ West Morgan Street
Raleigh, NC 27601

**2. Home and business phone number, fax number, and e-mail address.**

Counsel for Mr. De Luca is best reached via (919) 521-5878 (voice), (919) 882-1898 (fax), or jhoward@ghz-law.com.

**3. Are you either a candidate or registered voter eligible to vote in the protested election. If a candidate, for what office?**

Mr. De Luca is a properly-registered Wake County voter that in fact voted in the 2016 General Election.

**4. List the date, location, and exact nature of the election protested. Name all candidates in the election and the number of votes each received. Note the winning candidate(s) elected or nominated.**

The systemic flaw at issue stands to compromise all purported vote totals in the 2016 General Election.

**5. Does this protest involve an alleged error in vote count or tabulation? If so, please explain in detail.**

Yes, this protest challenges the tabulation of any contests that include unverified SDR voters. Mr. De Luca further challenges the certification of any 2016 General Election contests which include ballots cast by same-day registrants *that have not completed the mail verification process* mandated by N.C. Gen. Stat. § 163-82.7. Our objection is quite narrow: the Board should withhold tabulation and certification until such time as the verification process can run its course for SDR voters as it must for all other voters.

**6. Does this protest involve an irregularity or misconduct not described in number 5 above? If so, please give a detailed description of such misconduct or irregularity and name those who committed such action.**

>   This protest does not raise issues of misconduct by any person involved the administration of the 2016 General Election, but rather raises the systemic verification failures same day registration ("SDR") creates as previously established in this Board's May 19, 2015 report ("Report"), Judge Schroeder's opinion in *North Carolina State Conf. of the NAACP et al. v. McCrory, et al.,* 2016 W.L. 1650774, (slip op. p.102-11), and the Fourth Circuit's opinion in in the same case, *North Carolina State Conf. of the NAACP et al. v. McCrory*, 831 F.3d 204, 237 (4th Cir. 2016)("These concerns are real.").

**7. Please set out all election laws or regulations that you allege were violated in your responses to 5 or 6 above. State how each violation occurred. Please provide the names, addresses, and phone numbers of those who you allege committed such violations.**

>   As noted above, the temporal impossibility of verifying SDR registrants by the ordinary, statutorily scheduled date of the State Board's certification and canvass is well established. This nullification of our verification law violates N.C. Gen. Stat. § 163-82.7. The Board conceded as much in its May 19, 2015 memo, noting "for the mail verification system to function effectively, more time is needed than the time provided under the SDR system." *Report* at 6. In his Order digesting the trial of *North Carolina State Conf. of the NAACP et al. v. McCrory,* Judge Schroeder took note of similar findings in a 2009 Director Bartlett memo: "SDR simply failed to provide a sufficient <u>number of days</u> to permit the mailings to run their course to verify same-day registrants." (Slip op. at 105) (emphasis original). The district court went on to survey a wealth of data, State Board memos and reports, and legislative history. The court found "[t]hese data merely confirm what logic reveals must be the case - SDR's proximity to Election Day, well inside the twenty-five day registration cut-off, simply does not provide a sufficient number of days for the mail verification process to work, and thus effectively frustrates - or negates - North Carolina's process for verifying a voter's residence." *Id.* at 107. In reaching a different legal conclusion, the Fourth Circuit did not disturb Judge Schroeder's factual findings about the logistical impossibility of SDR. *See North Carolina State Conf. of the NAACP et al. v. McCrory,* 831 F.3d 204 (4th Cir. 2016). Indeed, the Court of Appeals said of the administrative burdens SDR presents "these concerns are real." *Id.* at 237.
>
>   Page seven of the Board's May 19, 2015 report distills the broader logistical dilemma into an easily-understandable summary:
>
>>  An individual who registered and voted on the last day of SDR, the Saturday before Election Day, would not even begin the process of mail verification until, at the absolute earliest, the following Monday. It is impossible that the mail verification card could even be delivered to the SDR registrant any earlier than the Tuesday of Election Day, much less returned undeliverable to the county Board of Elections by 5:00 P.M. the same day. Such an individual

would therefore appear to be immune to any challenge of his or her ballot based upon a lack of a verified mailing address."

**8. Please provide the names, addresses, and phone numbers of any witnesses to any misconduct alleged by you in this protest, and specify what each witness listed saw or knows.**

The failure of North Carolina's SDR and voter-verification laws to mesh are manifest. The State Board's 2015 Report, Judge Schroeder's decision, and the Fourth Circuit's opinion all underscore these problems.

**9. What action do you desire the county board of elections to take in this matter?**

We seek action by the State Board barring tabulation of votes including unverified SDR voters and to hold certification in abeyance unless and until SDR registrants are subjected to the same verification process all other voters face. This action is permitted under the Board's authority in N.C. Gen. Stat. § 163-182.12. A brief delay so that all registrants may be treated the same can cure the flaws identified in the State Board's May 19, 2015 report while remaining consistent with the Fourth Circuit's recent direction in *North Carolina State Conf. of the NAACP et al. v. McCrory.* Specifically, a delay by this Board can and should allow county boards time to complete their verification processes, sparing the dilution of properly-registered voters by thousands of improper ballots. *See, e.g.,* Report at 5 (identifying 2,361 votes in the 2012 General Election that later failed verification).

If the number of improperly-registered votes cast in 2012 is any guide, it could materially impact the resolution of one or more statewide contests. In Numbered Memo 2012-28 (Nov. 14, 2014), Director Bartlett required counties to report at canvass the number of unverified registrations they were facing in the 2012 General Election. It has become clear in recent days that many North Carolina counties have been unable to canvass along the normal schedule. The unrelated protests and investigations that have delayed these canvasses may lend help to solving this dilemma: a delay calculated to include sufficient time for SDR verifications to run their course could dovetail with these other resolutions while preventing the dilution of ballots by properly-registered voters.

**10. Do you contend the allegations set out by you are sufficient to have affected or cast doubt upon the results of the protested election? If your answer is yes, please state the factual basis for your opinion.**

Yes, the widespread inclusion of unverified ballots calls one or more statewide elections into question. This Board published a report on May 19, 2015 titled "May 2015: State Board of Elections Analysis of Mail Verification Failure Rates of SDR and Non-SDR voters." The report found 2.44% of SDR voters who voted ultimately failed mail verification. That figure, which reflects a failure rate five times higher than non-SDR voters, totaled 2,361 ballots. A total of this size in the 2016 General Election stands to be material to the outcome of one or more statewide elections.

The practical result is plain. "[I]n the 2012 general election alone, SDR required CBOEs to count the votes of at least 1,264 (we now know to be 2,361) SDR registrants who failed the State's mail verification after Election Day and the canvass." *North Carolina State Conf. of the NAACP et al. v. McCrory, et al.*, 2016 W.L. 1650774, (slip op. p.108).

**11. Have you read and reviewed the North Carolina law pertaining to election protests as set out in G.S. 163-182.9 through G.S. 163-182.14 and current North Carolina State Board of Elections regulations pertaining to election protests?**

Yes.

**12. How many pages of additional answer are attached to this protest?**

None

**How many pages of attachments are attached?**

For the convenience of the Board, the State Board's May 19, 2015 seven-page report is attached.

_Francis X De Luca_
Signature of Protestor

_____
Date/Time Filed with County Board

4



*Mailing Address*:
P.O. Box 27255
Raleigh, NC 27611-7255

Phone: (919) 733-7173
Fax: (919) 715-0135

KIM WESTBROOK STRACH
*Executive Director*

# May 2015: State Board of Elections Analysis of Mail Verification Failure Rates of SDR and Non-SDR voters

In February 2013, the SBOE produced a report entitled "Mail Verification Analysis of New Voters" ("the 2013 Report"). The 2013 Report presented data regarding the rates at which individuals who submitted a voter registration application in 2012 passed or failed "mail verification," the process required under State law, and under some circumstances federal law, by which it is confirmed that applicants for voter registration provided a correct address on their application, and are therefore eligible to vote in the jurisdiction.

The 2013 Report presented data showing the rates at which the addresses provided by Same Day Registration ("SDR") and non-SDR registrants could be verified, but did not expressly address voters who failed the verification process after their votes were counted. The analysis used proxy indicators based on a snapshot of voter registration data to determine mail verification rates. This report builds upon the 2013 Report by analyzing data not assessed in that report.

## Summary of the 2013 Report

The 2013 Report was based on a study conducted in January and February of 2013, which examined five different periods during which voter registration applications were received in 2012. Three of these periods reflect the traditional windows for voter registration when the "books are open" and registration applications are accepted and processed. These periods were January 1 – April 13, April 14 – July 17, and July 18 – October 12, 2012. (The "books are closed" during the 25-day period immediately preceding an election when new registration applications are not processed and no new registrants may be added to the rolls.) The remaining two periods reflect the times during which SDR applications were accepted, and are April 19 – May 5 and October 18 – November 3, 2012. SBOE staff queried the Statewide Elections Information Management System ("SEIMS") and received reports of the number and registration status of voters who applied during each period, current as of the time of later "snapshots" of registration data. A "snapshot" is essentially a picture of the data contained in the SEIMS database as of a particular moment in time. The 2013 Report relied on a snapshot taken in November 2012, and four snapshots from January and February, 2013.

When a new voter registration application is received, the applicant is entered into SEIMS and assigned a status code indicating the status of the applicant's registration and current position in the process of verification, as well as a "reason code" providing details of the basis for the status. As a voter goes through the verification process, the codes assigned to that voter will change. For the purposes of the 2013 study, these codes were considered a proxy indicator of whether the applicants had successfully completed the

mail verification process. The reported failure rates for each period were computed by dividing the number of applicants assigned one of the "failure" proxy indicator status codes into the total number of applicants for each period. If, as of the date of the snapshot used for the study, an individual was assigned a status/reason code of "denied – verification returned undeliverable," "inactive – confirmation not returned," or "inactive – confirmation returned undeliverable," the individual was considered to have "failed" mail verification.

In the table below, taken from page 1 of the 2013 Report, the "Undeliverable Rate" represents the percentage of new registrants during each time period considered to have failed the mail verification process based on their assigned status codes at the time of the snapshot, which is indicated by "Report Date." The shaded rows reflect the periods of one-stop absentee voting prior to the May Primary and the General Election during which SDR was conducted.

| Registration Period | Total New Registrations | Undeliverable Rate | Report Date |
|---|---|---|---|
| 01/01/2012 - 04/13/2012 | 146,485 | 3.20% | 2/6/2013 |
| 04/14/2012 - 07/17/2012 | 82,833 | 4.38% | 2/6/2013 |
| 04/19/2012 - 05/05/2012 | 18,086 | 1.15% | 11/27/2012 |
| 07/18/2012 - 10/12/2012 | 337,051 | 1.99% | 2/6/2013 |
| 10/18/2012 - 11/03/2012 | 97,100 | 1.30% | 1/7/2013 |

According to the study, the rate at which applicants failed to successfully complete the process during periods of SDR registration were 1.15% in the 2012 Primary Election and 1.30% in the 2012 General Election. The failure rates for the other, non-SDR periods in 2012 were reported as 3.20% (January 1 – April 13), 4.38% (April 14 – July 17), and 1.99% (July 18 – October 12). The remainder of the 2013 Report included various additional tables which portrayed the data included in this table in an expanded format.

### Additional Examination of Data From the 2013 Report

In order to more fully examine the rates at which voters could successfully cast ballots and later fail mail verification, SBOE staff has performed an additional level of analysis for this updated Report. Before that analysis was conducted, it was first necessary to correct the data included in the 2013 Report. Certain flaws in that data were discovered by SBOE staff in the course of preparing this updated Report. The methodology for developing the datasets is the same as was used in the 2013 Report, and in most cases, the exact same dataset was used.[1]

---

[1] The exceptions are the two periods in which SDR was conducted. The data used for these periods in the 2013 Report was inaccurate, and contained duplicates. For these periods, a snapshot taken on 3/22/13 was used in lieu of the snapshots utilized in the 2013 Report.

Case 5:16-cv-00913-D   Document 43-1   Filed 12/03/16   Page 6 of 11

| Registration Period | Total New Registrations | Undeliverable Rate | Report Date |
|---|---|---|---|
| 01/01/2012 - 04/13/2012 | 146,485 | 3.20% | 2/6/2013 |
| 04/14/2012 - 07/17/2012 | 82,833 | 4.38% | 2/6/2013 |
| 04/19/2012 - 05/05/2012 | 18,017 | 1.87% | 3/22/2013 |
| 07/18/2012 - 10/12/2012 | 337,051 | 1.99% | 2/6/2013 |
| 10/18/2012 - 11/03/2012 | 96,691 | 2.25% | 3/22/2013 |

The additional analysis reflected in the current report is not dependent solely upon the Undeliverable Rates, but instead applies an additional layer of data to that included in the 2013 Report: *whether the registrants included in the dataset voted*. The following table presents the same information regarding New Registrations and the Undeliverable Rates for each time period in the 2013 Report, but also includes whether the registrants voted, and reports the percentage of those registrants who were considered mail verification failures in the 2013 Report that also successfully voted.

| Registration Period | Total New Registrations | Total Undeliverable | Undeliverable Rate | Total New Registrations (Voted) | Total Undeliverable (Voted) | Undeliverable Rate (Voted) | Report Date |
|---|---|---|---|---|---|---|---|
| 01/01/2012 - 04/13/2012 | 146,485 | 4,681 | 3.20% | 94,975 | 552 | 0.58% | 02/06/2013 |
| 04/14/2012 - 07/17/2012 | 82,833 | 3,628 | 4.38% | 51,896 | 138 | 0.27% | 02/06/2013 |
| 04/19/2012 - 05/05/2012 | 18,017 | 338 | 1.87% | 17,960 | 335 | 1.87% | 03/22/2013 |
| 07/18/2012 - 10/12/2012 | 337,051 | 6,711 | 1.99% | 253,961 | 1456 | 0.57% | 02/06/2013 |
| 10/18/2012 - 11/03/2012 | 96,691 | 2171 | 2.25% | 96,529 | 2144 | 2.22% | 03/22/2013 |

Employing the same methodology, and in most cases the same base data as the 2013 Report, but comparing only those voters who cast ballots in one of the 2012 elections, the rate at which SDR registrants failed mail verification *and voted* is significantly higher than that of traditional registrants.

## Additional Analysis Based Upon Verification and Voting History

In an effort to better understand the interplay between SDR and the mail verification process, SBOE has examined the mail verification process for each voter instead of relying on proxy indicators. The results of this new study are set forth below.

In performing the new analysis, the 2012 Primary and General Elections were considered individually. Each voter was subjected to a five-part inquiry. That inquiry determined which voters registered in 2012, cast a ballot in a 2012 election, and subsequently failed their initial mail verification. Those voters were then divided according to whether they were traditional registrants or had registered using SDR in the election in question. In the first part of the analysis, these non-SDR and SDR voters were then compared to all 2012 registrants who had also voted in the election being considered, analyzing both the Primary and General Elections separately. In the second part, they were compared to all 2012 registrants, regardless of whether those registrants voted in either election.

| | Voters Who Failed Mail Verification After Voting 2012 Registrants Who Voted | | | | | |
|---|---|---|---|---|---|---|
| | 2012 Primary Election | | | 2012 General Election | | |
| Registration Method | Total Registered and voted in 2012 | Total Failed After Voting | Voted-But-Failed Rate | Total Registered and voted in 2012 | Total Failed After Voting | Voted-But-Failed Rate |
| SDR | 18,088 | 396 | **2.19%** | 96,924 | 2,361 | **2.44%** |
| Non-SDR | 46,293 | 104 | 0.22% | 475,096 | 2,306 | 0.49% |

Part One::::::::

In the **2012 Primary Election**, 396 SDR registrants voted prior to failing mail verification out of the 18,088 voters who registered using SDR in that election, for a voted-but-failed rate of 2.19%. Of the 46,293 non-SDR registrants who registered in 2012 (prior to the Primary Election), only 104 were able to cast a ballot after failing to complete mail verification successfully, for a voted-but-failed rate of 0.22%. In the 2012 Primary Election therefore, SDR registrants cast ballots and later failed mail verification at a rate approximately ten times higher than the 2012 non-SDR registrants who participated in the primary.

In the **2012 General Election**, 2,361 SDR registrants failed mail verification after voting out of the 96,924 total SDR registrants who voted, for a voted-but-failed rate of 2.44%. Of the total 475,096 non-SDR registrants who registered in 2012 and voted in the 2012 General Election, 2,306 failed mail verification after voting, for a voted-but-failed rate of only 0.49%. In this analysis, SDR registrants were able to cast a

Case 5:16-cv-00913-D   Document 43-1   Filed 12/03/16   Page 8 of 11

ballot which was counted prior to failing mail verification at a rate five times higher than that of non-SDR voters who registered in 2012.

Part Two

| | 2012 Primary Election | | | 2012 General Election | | |
|---|---|---|---|---|---|---|
| Registration Method | Total Registered in 2012 | Total Failed After Voting | Voted-But-Failed Rate | Total Registered in 2012 | Total Failed After Voting | Voted-But-Failed Rate |
| SDR | 18,247 | 396 | **2.17%** | 97,373 | 2,361 | **2.44%** |
| Non-SDR | 175,834 | 104 | 0.06% | 680,904 | 2,306 | 0.34% |

Voters Who Failed Mail Verification After Voting — All 2012 Registrants

In the second phase of the analysis, the same two groups of SDR and non-SDR voters who failed mail verification after voting in each election were compared to all 2012 SDR and non-SDR registrants, respectively, with no consideration given to whether they voted in the election under examination:

In the **2012 Primary Election**, the number of voters who failed mail verification after voting remained 396, but was compared to all 18,247 registrants who used SDR in that election. The voted-but-failed rate decreased slightly to 2.17%. When the same analysis was applied to non-SDR voters, the voted-but-failed rate dropped significantly to only 0.06%. The same 104 voters from the first part of the analysis was this time compared to all of the 175,834 new non-SDR registrants who had registered in 2012 prior to the May primary. The rate at which SDR voters cast ballots and later failed mail verification was over thirty-six times higher than that of the non-SDR registrants.

In the **2012 General Election**, the same 2,361 SDR registrants failed mail verification after voting, but out of the 97,373 total SDR registrants, for a voted-but-failed rate of 2.44%. Of all 680,904 traditional, non-SDR registrants who registered in 2012, the same 2,306 failed mail verification after voting, for a voted-but-failed rate of only 0.34%. In this second analysis of the 2012 General Election, SDR registrants were able to cast a ballot which was counted prior to failing mail verification at a rate seven times higher than that of non-SDR registrants who registered in 2012.

Case 5:16-cv-00913-D   Document 43-1   Filed 12/03/16   Page 9 of 11



## How SDR and Mail Verification Affect the Orderly Administration of Elections

In 2012, 680,904 new voters registered in a traditional, non-SDR period. Of those new registrants, 475,096 participated in the 2012 General Election. Of those new traditional registrants who voted, 95.6% voted *after* their eligibility was confirmed by completing initial mail verification. In contrast, 97,373 new voters registered using SDR in the 2012 General Election, and all but 449 voted. Of the 96,924 who cast a ballot, 96.2% voted *before* their eligibility to participate could be verified through the required process of mail verification. This data suggests that for the mail verification system to function effectively, more time is needed than the time provided under the SDR system.

The inherent tension between SDR and the time needed for adequate mail verification does not appear to be reduced by ballot retrievability during early voting. The staute requiring the retrieval of mail-in absentee ballots was not intended to prevent the ballots cast by voters who later fail to verify from counting, and therefore does not appear to address the issues posed by the tension between SDR and mail verification. Indeed, in the 2012 election, some counties did not even begin the process of mail verification of SDR registrants until after the canvass, and there was therefore no opportunity in those counties to retrieve any ballot cast by a voter whose eligibility was not verifiable.

SBOE has previously advised county Boards of Election that absentee ballots cast by SDR voters who subsequently fail mail verification prior to canvass could be treated as "disputed ballots," but that "[i]t

must be emphasized that the failure of the verification process does not necessarily mean that the voter should not have cast a ballot, but it does mean that if the outcome of an election could have been affected by their participation then further investigation is needed to determine if the voter properly participated in the election." Unverified Registrations, N.C. SBOE Numbered Memo 2012-28, 1 (2012).

The Memo went on to state that "[u]nder its quasi-judicial authority, a county board may render a decision on the legitimacy of a ballot application during the county's canvass. If a county board finds evidence of a voting irregularity, the board may remove from the vote totals a previously counted absentee ballot." Id., at 2 (citing N.C. Gen. Stat. § 163-182.5(a)). This guidance seems to suggest that county Boards of Election could choose not to count absentee ballots cast by voters who have failed mail verification, but only under circumstances where counting them could impact the outcome of an election. We are unable to ascertain the statutory basis for this guidance.

The actual "safeguard" provided by the statute governing mail verification, prescribing a challenge process, is itself similarly inadequate. N.C. Gen. Stat. § 163-82.7(g)(2) provides that "[i]f a [mail verification] notice mailed under subsection (c) or subsection (e) of this section is returned as undeliverable after a person has already voted by absentee ballot, then that person's ballot may be challenged in accordance with G.S. 163-89." It specifies that "[t]he absentee ballot of any voter may be challenged on the day of any statewide primary or general election or county bond election beginning no earlier than noon and ending no later than 5:00 P.M., or by the chief judge at the time of the closing of the polls..." N.C. Gen. Stat. § 163-89(a). An individual who registered and voted on the last day of SDR, the Saturday before Election Day, would not even begin the process of mail verification until, at the absolute earliest, the following Monday. It is impossible that the mail verification card could even be delivered to the SDR registrant any earlier than the Tuesday of Election Day, much less returned undeliverable to the county Board of Elections by 5:00 P.M. the same day. Such an individual would therefore appear to be immune to any challenge of his or her ballot based upon a lack of a verified mailing address.

## Conclusion

The purpose of mail verification is to prevent ineligible applicants from casting ballots. The additional analysis reflected in this report demonstrates that mail verification requires time to complete to ensure this gatekeeping function and that the traditional period of registration better ensures that persons casting ballots in primary and general elections are eligible to vote in the jurisdictions they are registered to vote.