**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

FRANCIS X. DELUCA,

                Plaintiff,

v.

NORTH CAROLINA STATE BOARD OF
ELECTIONS; KIM WESTBROOK STRACH,
in her official capacity as Executive Director of
the State Board; and A. GRANT WHITNEY,
RHONDA K. AMOROSO, JOSHUA D.
MALCOLM, JAMES BAKER, and MAJA
KRICKER, in their official capacities as
members of the State Board of Elections,

                Defendants,                  No. 5:16-cv-913

and

LEAGUE OF WOMEN VOTERS OF NORTH
CAROLINA, *et al.*,

and

NORTH CAROLINA STATE CONFERENCE
OF THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE,

                Defendant-Intervenors.

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

State Defendants submit this response brief and the supporting exhibits in opposition to Plaintiff's

Motion for a Preliminary Injunction.

## INTRODUCTION

North Carolina has long litigated its most important questions of election law in cases

setting precedents that often marked the outer boundaries on issues relevant nationwide. Now—in an era of smart data analytics, razor-thin margins, and a striking shift in which *most North Carolinians cast "retrievable" ballots*—Plaintiff seeks to enlist this Court in a broader effort to litigate an election after the fact. This Court should exercise characteristic restraint and apply traditional legal standards preservative of federalism to deny the extraordinary relief Plaintiff seeks.

This lawsuit challenges a statutory registration process that has for eight years provided opportunities both to register and to vote at certain "one-stop" early voting sites in the weeks preceding Election Day. Whatever the shortcomings of this "same-day registration" process, violation of federal law is not among them.

## STATEMENT OF FACTS

### A. Qualification and Registration

Except where otherwise preempted by federal law, qualifications to vote in North Carolina are governed exclusively by the State's Constitution. N.C. CONST. art. VI, §§ 1-5. Residency requirements have been narrowed by legal challenges, *see Andrews v. Cody*, 327 F. Supp. 793 (M.D.N.C. 1971), aff'd, 405 U.S. 1034 (1972), to require only that the voter reside "in the precinct, ward, or other election district for 30 days next preceding an election." N.C. CONST. art. VI, § 2. Registration is characterized by two features: (1) "Every person offering to vote shall be *at that time* legally registered," and (2) the General Assembly is empowered to "enact general laws governing the registration of voters." N.C. CONST. art. VI, § 3 (emphasis added). The General Assembly acted under the latter grant to create a system of county-based voter registration, under which an eligible citizen must submit an appropriate registration application to the county board of elections within the voter's county of residence. N.C. GEN. STAT. §§ 163-82.6 and 163-

2

82.11(d). Technical data sharing arrangements and the enactment of the National Voter Registration Act of 1993 (NVRA) broadened registration opportunities through the Division of Motor Vehicles, § 163-82.19, certain public assistance agencies, §§ 163-82.20, 82.21, 82.22, and 82.23, and through same-day registration ("SDR") opportunities at one-stop early voting locations during a 17-day early voting period that ends the Saturday before Election Day, § 163-82.6A (as reinstated by *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016)), at **Exhibit 11.**

The registration process begins with a standard federal application form or North Carolina form promulgated by the State Board of Elections ("State Board"), the administrative and quasi-judicial agency responsible for the supervision of election process statewide. §§ 163-22 and 163-82.4. The form requires that an applicant attest to his or her qualifications and provide a full name, birthdate, address, and signature. *See* **N.C. State Board of Elections, North Carolina Voter Registration Application, at Exhibit 1**. If the applicant's "residence is not a traditional residence . . . then the location of the usual sleeping area" may be indicated by drawing a map in a box provided for that purpose. *Id.* and § 163-57(1)(c). The voter may, at his or her option, provide the last four digits of his or her Social Security number or North Carolina driver's license or non-operator's identification number. If the voter provides either number, the State Board works to validate the voter's identity through a data-sharing arrangement with the Division of Motor Vehicles and the Social Security Administration as required under the Help America Vote Act of 2002 (HAVA). *See* § 163-82.19(b). If, however, the identification number does not validate, the voter will be asked to present either a current and valid photo identification or a copy of one of the following documents showing the voter's name and address: current utility bill, bank statement, government check, paycheck, or other government document. N.C. GEN. STAT. § 163-166.12(a).

3

Ordinarily, registrants must submit their application form no later than 25 days before the date of the election, § 163-82.6(c), though certain individuals who become qualified to vote after the deadline can submit a voter-registration form on the day of the election. § 163-82.6(d). An exception to the general deadline applies to same-day registration applicants is discussed further below. A voter whose application was not processed due to a deficiency in his or her voter registration application may vote a provisional ballot, which will count if the voter cures the defect by providing correct information to the county board of elections office before 5:00 p.m. on the day before county canvass, nine days after Election Day. Stat. §§ 163-82.4(e) and 163-182.5(b).

## B.    List Maintenance

In an effort to verify whether a registrant remains eligible to vote between elections, the General Assembly has enacted certain list maintenance procedures relying on a mail verification process and change of address tracking through the U.S. Postal Service, deceased citizen records maintained by the Department of Health and Human Services, felony records maintained by State and Federal law enforcement, and the assignment of unique identifiers to maintain a uniform voter file tracking activity between counties. §§ 163-82.7, 163-82.11, and 163-82.14. All such activity is centrally monitored and organized through North Carolina's Statewide Elections Information Management System ("SEIMS").

Plaintiff makes much of North Carolina's mail verification process in general, § 163-82.7, and as it relates to SDR in particular, § 163-82.6A(d) (as reinstated by *McCrory*). The mail verification process initiates after a county board of elections processes a voter registration application, so long as the elections official does not have an indication the application is defective (for example, the voter is underage or indicated she is not a citizen). Barring such a defect, the county elections official generates and prints a notice from SEIMS, which is sent to the applicant

by non-forwardable mail. State law requires that the application be approved "if the Postal Service does not return the notice as undeliverable," and the county board of elections shall register the applicant to vote unless the notice is returned as undeliverable. § 163-82.7(d). The mandate is framed in the negative, hinging on the non-occurrence of returned mail. To avoid inconsistent determinations between counties, SEIMS is programed to list as "verified" any registrant whose initial notice has not returned 15 days after mailing. Declaration of Brian Neesby, ¶ 11, **at Exhibit 2**. If, the notice returns thereafter, SEIMS is programed to change the status back to "unverified" and to prompt a second notice required under N.C. GEN. STAT. §§ 163-82.7(e). *Id.*

The second notice is sent in the same manner as the first, and if it fails to return as undeliverable after 15 days, SEIMS is programed to classify the voter as verified. Mail is not always reliable, and multiple mailings sent to the same address may yield different return rates, though it remains a legitimate tool in North Carolina's effort to verify registrations. If the U.S. Postal Service returns the second notice as undeliverable, the county board "shall deny the application," *unless* the voter has already voted, in which case the voter will be removed from the rolls if she fails to appear to vote in the subsequent two Congressional elections. *Compare* §§ 163-82.7(f), 163-82.7(g)(3), and 163-82.14(d)(2). Retention of non-verified voters for at least two Congressional elections mirrors Federal requirements under Section 6 of the NVRA. *See* 52 U.S.C. §§ 20507(b)(2) and 20507(d)(1)(B).

Contrary to Plaintiff's statement that "traditional voters have their registrations verified before they are allowed to vote," *see*, Email from Francis DeLuca, President, Civitas Institute (Nov. 30, 2016), at **Exhibit 3**, no law requires that the mail verification process be completed before a qualified individual is permitted to vote. Indeed, the notion of a "complete" verification clashes awkwardly against the statute framed in the negative one in which only those who have

5

failed mail verification can be said to have "completed" it. The dilemma is not hypothetical. Analysis of a snapshot of North Carolina's registration database on Election Day (November 8, 2016) indicates that more than 1.3 million voters were listed in SEIMS with a status *other than* "verified." Neesby Aff. ¶ 7. The figure excludes any voter whose registration began using SDR. To be clear, *any one of these 1.3 million individuals were properly registered and would have been entitled to cast a regular ballot if they chose to do so.*

The mail verification process is not a stand-in for the broader residency requirement prescribed by the State Constitution. N.C. CONST. art. VI, § 2. "Completion" of the process is not prerequisite to voting. Mail verification is a reasonable measure available to the General Assembly in its effort to fortify against fictitious registrations and incorporate needed checks to maintain the accuracy of the voter rolls. Reliance on postal delivery and return processes is an imperfect proxy for the residency qualification required under the State's Constitution, which seek to verify whether a particular registrant resided within the jurisdiction for 30 days leading up Election Day.

### C. Same-Day Registration

The above-described qualification, registration, and mail verification processes intersect uniquely in the context of SDR, a process by which any qualified voter may "register in person and then vote at a one-stop voting site in the person's county of residence." N.C. GEN. STAT. § 163-82.6A (added by N.C. Sess. Law 2007-253, § 1, amended by N.C. Sess. Law 2009-541, § 11, repealed by N.C. Sess. Law 2013-381 § 16.1, and reinstated by *McCrory*). Nearly 400,000 voters have used SDR in the eight years following its enactment. Neesby Decl. ¶ 8.

An SDR registrant must complete a traditional voter registration application *and* provide "proof of residence" by presenting any one of list of "valid documents that show the person's

current name and current residence address." § 163-82.6A(b)(2) (as reinstated by *McCrory*). Acceptable forms of identification include a North Carolina driver's license, government photo identification, current utility bill, bank statement, government document or check, paycheck, and certain other documents approved by the State Board.[1] §§ 163-82.6A(b)(2) (as reinstated by *McCrory*) and 163-166.12(a)(2); *see also* N.C. State Board of Elections, Notice to Same-Day Registrants, at **Exhibit 4**, and Numbered Memo 2016-15, from Kim Strach, Executive Director, to County Boards of Election (Sept. 22, 2016), at **Exhibit 5**.

Notwithstanding added identification requirements, State law directs elections officials to "proceed under G.S. 163-82.7 to verify [an SDR registrant's] address" within two business days "of the person's registration under this section." § 163-82.6A(d) (as reinstated by *McCrory*). All ordinary verification procedures are performed on an expedited basis, *id.*, and the State Board daily publishes a public list of same-day registrants on its website throughout the one-stop voting period.

State Defendants have not shied from highlighting the low utility of mail verification in the context of SDR. *See* ECF No. 359 at 19, *N.C. State Conf. of the NAACP v. McCrory*, No. 1:13-cv-658-TDS-JEP (M.D.N.C. July 29, 2015) (7/29/15 Trial Testimony of K. Strach) (emphasis added) excerpts attached at Exhibit 6; *see also* "State Board of Elections Analysis of Mail Verification Failure Rates of SDR and Non-SDR Voters" (May 19, 2015) attached at **Exhibit 7**.

---

[1] The documentary requirements for same-day registrants differ from the requirements for individuals who register prior to the voter registration deadline. *All* individuals who same-day register are required to provide valid documentation showing proof of residence, whereas non-SDR registrants are only required to show proof of identification if they have (1) not previously registered to vote in North Carolina and (2) failed to provide the last four digits of Social Security number or North Carolina driver's license or non-operator's identification number that could be verified. *See* N.C. GEN. STAT. §§ 163-82.6A(b)(2) (as reinstated by *McCrory*), 163-166.12(a), and 163-82.19(b). Additionally, while a non-same-day registrant could, for example, show a Costco Club membership card or driver's license with an out-of-date residence address as proof of identification, a same-day registrant would not be permitted to show these documents as proof of residence.

### D.    Challenge

To dispute a ballot of a voter who has already cast a ballot through absentee voting or who is preparing to cast a ballot on Election Day, a timely challenge must be brought. N.C. Gen. Stat. § 163-87. The only method to retrieve and discount the ballot of an absentee voter who has had a returned first or second verification mailing is through a voter challenge, *see* N.C. Gen. Stat. § 163-82, and any challenge of an absentee SDR voter must be brought by Election Day. N.C. Gen. Stat § 163-89. The district court in *McCrory* recognized this limitation: "Ballots cast by same-day registrants, like all other absentee ballots, are counted on Election Day; under statute, they must be challenged, if ever, on Election Day."[2] *N.C. State Conf. of the NAACP v. McCrory*, No. 1:13CV658, 2016 WL 1650774, at *105 (M.D.N.C. Apr. 25, 2016), *rev'd and remanded,* 831 F.3d 204 (4th Cir. 2016).

This has long been the position of the State Board of Elections. *See* SBOE Numbered Memo 2012-28 from Gary O. Bartlett, Executive Director, to Directors of County Boards of Election (Nov. 14, 2012), ("For registrations that have failed the mail verification process, note that the time for challenging their one-stop absentee ballot ended at 5:00 p.m. on Election Day."), at *Exhibit 8*, and Order In the Matter of: Consideration of Certain Legal Questions Affecting the

---

[2] In a footnote, the Court further explained the basis for its conclusion:

> Former Director Bartlett claimed in the SBOE's 2009 memo that "[a]s long as the second notice is returned prior to canvass, then the one-stop registrant's registration can be denied and their in-person absentee ballot appropriately disapproved" . . . Bartlett's claim that the registrant's registration can be denied is incorrect. By the canvass day, the registrant has either voted or not. If the registrant has voted, then failing mail verification will merely make his registration inactive and subject him to the confirmation mailing process. See N.C. Gen. Stat. § 163–82.7(g)(3); (Doc. 340 at 208–09). Bartlett's claim that CBOEs can simply reject the SDR absentee ballot on the canvass date is also contrary to Strach's testimony, (Doc. 336 at 157 (saying that absentee ballots not challenged by Election Day are not retrievable)), and § 163–89.

*McCrory*, 2016 WL 1650774, at *105 n.162.

Authentication of the 2016 General Election (November 28, 2016) ("The county board of elections shall dismiss a protest of election that merely disputes the eligibility of a voter. The county board shall instead consider the claim as a voter challenge brought under Article 8 after the election."), at *Exhibit 9.*

## E.    Canvass

Qualification requirements for absentee voters participating by mail or in-person during the early voting period are judged as of election day. *See* N.C. GEN. STAT. §§ 163-226(a) ("Who May Vote Absentee Ballot; Generally. Any qualified voter of the State may vote by absentee ballot in a statewide primary, general or special election . . . in the manner provided in this Article."), 163-226(c) ("The Term 'Election'. - As used in this Subchapter, unless the context clearly requires otherwise, the term 'election' includes a general, primary, secondary primary, runoff election, bond election, referendum, or special election."), and 163-227.2(a) (designating one-stop early voting as a method involving "an application for absentee ballots"). Indeed, for all voters, residency qualifications are judged as of the day of the election under N.C. CONST., art. VI, § 2, and this approach is consistent with the constitutional requirement that all those appearing to vote must be "*at that time*" registered. N.C. CONST., art. VI, § 3 (emphasis added). After paper absentee ballots by SDR registrants are tabulated, those ballots are retrievable only through a manual process of identifying a unique number associated with an absentee voter and then combing through ballot stacks to retrieve the linked ballot. All methods of absentee balloting are, in this way, "retrievable."

Canvass—the official process by which votes are tabulated and election results authenticated—marks the final step phase in finalizing an election, and is a prerequisite to candidates assuming office. At the time of this submission, all county boards of election have

canvassed their results. N.C. GEN. STAT. § 163-182.5(a). Statewide canvass was set by statute to occur for the general election on November 29, 2016, but the State Board of Elections may "adjourn for not more than 10 days to secure the missing abstracts" from county boards of elections: Friday, December 9, 2016. *See* N.C. GEN. STAT. § 163-182.5(c). Six days after it completes canvass for a general election, the State Board is required to issue certificates of election, N.C. GEN. STAT. § 163-182.15(b), which are the official legal documents that "confer[] upon a candidate the right to assume an elective office as a result of being elected to it." N.C. GEN. STAT. § 163-182(2).

Additionally, presidential electors meet on December 19, 2016, to vote on behalf of North Carolina for President and Vice-President of the United States. *See* N.C. GEN. STAT. § 163-182.15(b) and 3 U.S.C. § 7. The "safe harbor" provision of 3 U.S.C. § 5 that "assure[s] finality" to a State's final determination in an election contest requires that this determination be made by December 13, 2016 at the latest. *See Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J. concurring). This provision guarantees that the votes of the presidential electors selected to represent the State will be counted in the Electoral College.

## ARGUMENT

Plaintiff has not met his burden to "establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Direx*

*Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (alteration and internal quotation marks omitted); *see Centro Tepeyac*, 722 F.3d at 188 ("A preliminary injunction is an extraordinary remedy." (internal quotation and citation omitted)). Moreover, "when the preliminary injunction is mandatory rather than prohibitory in nature, th[e] Court's application of this exacting standard of review is even more searching." *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (internal quotation and citation omitted).

Plaintiff's requested remedy misunderstands North Carolina law governing both the treatment of a ballot when a voter fails mail verification—in which case the vote is counted, absent a timely challenge—and the timing of mail verification processes—there is no finite point at which verification is "complete." Still, Plaintiff asks this Court to "bar the State Board from certifying until the Board can attest all voters are being treated equally by the inclusion of only verified voters in final counts." Doc. No. 43 at 9. A delay in certification of the election would not on its own result in the inclusion of "only verified voters in final counts," because state law does not permit discounting the ballots of individuals who fail mail verification after the election, absent a timely voter challenge. *See McCrory*, 2016 WL 1650774, at *105. State law acts to render *verification* as the occurrence of a non-event: The absence of a notice to returned by the Postal Service. § 163-82.7. Since time alone will not give Plaintiff the relief he seeks, he must root his claim of irreparable harm in a deprivation of rights which warrants the severe intervention of this Court in the electoral process of this State. Plaintiff's fails to give this Court sufficient basis to do so

I.     **PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.**

    **A.  Plaintiff Does Not Properly Allege a Violation of the Fourteenth Amendment**

The Constitution of North Carolina requires the General Assembly to "enact general laws governing the registration of voters," N.C. CONST. art. VI, § 3,  and the State may do so freely

without Federal intervention, except where those enactments burden the franchise on the basis of sex, ethnicity, age, wealth, or parentage; or where the State's registration program otherwise conflicts with prophylactic enactments extending special protections to language and racial minority groups under enabling provisions of the Reconstruction Amendments. This arrangement preserves North Carolina's authority and "exemplifies the role of States as laboratories" in an ongoing effort to strike the appropriate balance between registration opportunities and the integrity of the voter rolls. *Gonzales v. Raich*, 545 U.S. 1, 42 (2005); *see Oregon v. Mitchell*, 400 U.S. 112, 124–25 (1970) ("Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections").

Plaintiff brushes past such notions of restraint: "Strict scrutiny clearly applies . . . because SDR infringes Plaintiff's due process rights," Doc. No. 43 at 6. This Court should reject Plaintiff's invitation to recognize a new "class of late-appearing SDR voters" or "preferred class of unverified voters." Doc. No. 43 at 6 and 8. Fortunately, the Fourteenth Amendment is not so elastic, nor the Tenth Amendment so thin. Indeed, a suspect class is one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28 (1973). No such element is met here, and a novel theory under which distinctions based on mail verification status are now suspect would lead to a result contrary to that requested by Plaintiff: Elimination of mail verification requirements entirely—a result both State Defendants and Plaintiffs wish to avoid.

Plaintiff is unlikely to succeed on his equal protection claim, as mail verification is not a precondition to participation, and any distinction based on mail verification did not impermissibly burden SDR applications *vis a vis* the more than 1.3 million non-SDR registrants entitled to vote

without limitation on November 8, 2016.

Plaintiff's claim would appear better packaged as a claim of "vote dilution," though it contrasts starkly against a   history of jurisprudence limiting such claims to the review of malapportioned districts, *see Reynolds v. Sims*, 377 U.S. 533, 565 (1964), and minority voting power under Section 2 of the Voting Rights Act, *see Thornburg v. Gingles,* 478 U.S. 30, 87 (1986) ("The phrase 'vote dilution,' in the legal sense, simply refers to the impermissible discriminatory effect that a . . . districting plan has when it operates to cancel out or minimize the voting strength of racial groups.") (O'Connor, J., concurring) (internal citations omitted).

Plaintiff's claim is not one of disenfranchisement or undue burden of the type warranting close scrutiny. *See Dunn v. Blumstein, 405 U.S. 330* (1972)  (invalidating a lengthy durational residency requirements), *Kramer v. Union Free School District No. 15*, 995 U.S. 621 (1969) (invalidating property ownership and parentage requirements for prior to registration for school board elections), *Carrington v. Rash*, 380 U.S. 89, 93 (1965) (invalidating registration requirements enacted "to prevent the danger of a 'takeover' of the civilian community resulting from concentrated voting by large numbers of military personnel in bases"), *Rice v. Cayetano*, 528 U.S. 495 (2000) (invalidating registration requirements based on racial ancestry), *Symm v. United States*, 439 U.S. 1105 (1979) (invalidating registration requirements unique to college students).

Instead, Plaintiff argues that current law burdens registration too little. This lawsuit amounts to a policy statement in a broader debate with a lengthy history.  *See e.g.*, N.C. Sess. Laws 2007-253, § 1, 2009-541, § 11, 2013-381.  It belongs there, and State Defendants urge respect for the limiting principle that "equal protection analysis requires strict scrutiny . . . only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312

(1976).

The proper standard governing Plaintiff's constitutional claim is the weighing inquiry described in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* test, this Court would weigh Plaintiff's asserted injury against the justifications undergirding North Carolina's legitimate interest in regulating the conduct of elections—the greater the injury, the greater necessity for narrowly drawn policies. *See Anderson,* 460 U.S. at 789. This test rightly acknowledges virtually every aspect of North Carolina's election law "whether it governs the registration and qualifications of voters . . . or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote," but may be constitutional nonetheless. *Burdick*, 504 U.S. at 433.

The Supreme Court's decision in *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969), is illustrative of the level of scrutiny appropriate in this case. The *McDonald* Court rejected an inmate's equal-protection suit to enjoin an Illinois statute limiting the availability of absentee balloting opportunities to the medically disabled and those traveling abroad. 394 U.S. at 807. Though the the statute broadened participation opportunities for some but not others, the Court concluded that it did not need to apply an "exacting approach" because absentee-ballot statute did not discriminate on basis of a suspect class and did not act to disenfranchise the plaintiff. *Id.* The Court instead applied rational basis review to conclude that the legislature did not act arbitrarily. *Id.* at 808–10 (holding that the legislature acted rationally in "a judicially incapacitated, pretrial detainee" differently from a physically disabled individual presenting with a physician's affidavit). Plaintiff is not disenfranchised, and, should he move or otherwise find himself removed from the voter rolls in his county of residence, SDR remains as available to him as it does to every other eligible citizen. Like in *McDonald*, North Carolina's voter-qualification standard need only pass

rational basis review: The voter-qualifications standard does not discriminate on the basis of suspect class or disenfranchise Plaintiff.[3]

## B. North Carolina's Same-Day Registration Procedures Do Not Violate the NVRA

Contrary to Plaintiff's assertions, neither the purpose nor express terms the National Voting Registration Act of 1993 support his conclusion that State Defendants should not count the votes of those registered through SDR and whose mail verification notice is returned. Quite the opposite: Both the NVRA and corollary provisions in State law make clear that an individual timely registered shall be allowed to vote in the election. See N.C. GEN. STAT. § 163-82.7(g)(3) and 52 U.S.C. § 20510(b)(2). To the extent the NVRA and Chapter 163 of the General Statutes provide for the maintenance of voting records, both bodies of law statutes make clear that the mail verification failures will not alone disqualify an individual who has voted.

## 1. Plaintiff Lacks Standing Under the National Voting Rights Act.

As an initial matter, Plaintiff lacks standing under the statute authorizing a private right of action under Section 9 of the NVRA, since he has not provided written notice 90 days prior to filing his action as required by statute. 52 U.S.C. § 20510(b)(2). Plaintiff has failed to exhaust his administrative remedy and chose instead to file a protest of election authorized under Article 15A of the General Statutes concurrently with a copy of the Summons and Complaint in this action.[4]

---

[3] Plaintiff cites to a single, unpublished district court case in support of his claim. In *Harlan v. Scholz*, No. 16C7832 (N.D. Ill. Sept. 27, 2016) (unpublished), Doc. No. 43 App. D, *stayed on appeal*, the court held that a claim that an election-day registration scheme that was only available in counties with a population 100,000 or more burdened the plaintiff had a likelihood of success on the merits. This case addresses the geographically disparate treatment of registrants, which is wholly different from North Carolina's same-day registration process that is available to any eligible individual in the state.

[4] It bears noting that Plaintiff in this case is the head of Civitas Institute ("Civitas"), an organization, that is active in election processes in North Carolina. In fact, Civitas was subpoenaed to produce documents as part of the *McCrory* lawsuit that challenged portions of N.C. Session Law 2013-381, including same-day registration. *See* Email from Francis De Luca,

Absent the accrual of a private right of action under Section 9, Plaintiff's claim against the State is barred by the Eleventh Amendment immunity bars his suit. *See Ex parte Young*, 209 U.S. 123, 150 (1908).

An exception to this bar, however, may exist for ongoing violations of federal law by a state official when the relief sought is prospective injunctive relief for the official's ongoing violation of federal law. *Id.* at 157. Congress codified the *Ex parte Young* doctrine in the NVRA and authorized persons to file suit for "declaratory and [prospective] injunctive relief with respect to [a] violation" of the Act. 52 U.S.C. § 20510(b)(2). Congress, however, expressly conditioned this *Ex parte Young* relief: (1) upon "written notice of a violation to the chief election official of the State involved," U.S.C. § 20510 (b)(1); and (2) only "if the violation is not corrected within 90 days" of the written notice, or 20 days if the violation occurred 120 days before a federal election. 52 U.S.C. § 20510(b)(2). If the violation occurs "within 30 days before the date of an election for Federal office," the individual is not required to provide notice prior to bringing a civil suit under § 20510(b)(2).

Here, the violation Plaintiff alleges—the counting of votes cast by voters whose "voter registrations have not been properly verified", Doc. No. 5 at ¶ 38—occurred after the date of the 2016 general election and therefore required that Plaintiff provide the State Board's Executive Director with written notice and 90 days to consider the matter and take appropriate remedial action. Plaintiff had four months in which he might have filed suit after the Fourth Circuit issued its decision in *McCrory,* 831 F.3d 204, on July 29, 2016. Still he waited until November 21, 2016, two weeks after the general election, to file a complaint, when the unofficial outcomes of the election were already known.

President, Civitas Institute (Sept. 10, 2016), at Exhibit 10.

When a plaintiff fails to meet the notice requirements for the NVRA's private right of action, the district court lacks jurisdiction to consider his claim. *See, e.g.*, *Ga. State Conf. of NAACP v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012) (plaintiff lacked standing where he failed to provide notice prior to serving an amended complaint) and *Krieger v. Loudon County*, 2014 WL 4923904, at *5 (W.D. Va 2014) (unpublished) (a plaintiff claim's that he was denied the right to vote because the state did not assist him with his voter registration application failed to meet the NVRA's jurisdictional notice requirement where his complaint did not allege that he had provided the state's chief election officer with notice prior to filing suit). Because Plaintiff did not advise the Executive Director of his claim prior to filing his Complaint and waiting the requisite number of days, he has not furnished this Court with jurisdiction sufficient to decide his NVRA claim, and no preliminary injunction should issue.

## 2. Alternatively, the State's Same-Day Registration Statute is Consistent with the NVRA

To the extent this Court believes jurisdiction is appropriate for the NVRA claim, State Defendants comply fully with the provisions of that Act. Plaintiff cites to 52 U.S.C. § 20507(a)(4) in his claim that State Defendants have failed to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists" who have become ineligible due to death or change of residence. Consistent with this requirement, the General Assembly has enacted statutes constituting just such a systematic program of list maintenance, which by its own terms must be "nondiscriminatory and shall comply with the provisions of the Voting Rights Act." N.C. GEN. STAT. § 163-82.14. The NVRA does not specify procedures covering every form of list maintenance, nor does it require that a state engage in a program of mail verifications for new voter registration applications.

Contrary to Plaintiff's mistaken understanding of the role of mail verification in the State's

process, the NVRA does not require the State to implement a mail verification procedure to verify the residency of registrants, much less provide that the mail verification process must be complete before a state can count the ballot of a voter. See *McCrory*, 2016 WL 1650774, at *110 (stating that the requirement that unreported mover be allowed to vote prior to mail verification comes "not from State law but from § 8(e) of the NVRA, which requires North Carolina to accommodate unreported movers"). Absent some future showing of express preemption in mandating a comprehensive and exclusive list maintenance system established by Congress, Plaintiff has given this Court no basis to conclude that North Carolina's approach is not "reasonable."

Plaintiff appears unaware that it would be a violation of the NVRA to remove voters from the rolls based only on returned mail verification, without first providing notice under Section 8 and waiting two federal election cycles of inactivity, unless the voter voluntarily updates his or her address. 52 U.S.C. § 20507(d)(1). Section 4 of the NVRA provides that "[i]f a notice of the disposition of a mail voter registration application under section 20507(a)(2) of this title is sent by nonforwardable mail and is returned undelivered, the registrar may proceed in accordance with section 20507(d) of this title," and under Section 8 a person can only be removed from the rolls (1) upon request or (2) after failing to respond to a confirmation notice and if the individual has not voted or appeared to vote in two federal election cycles. 52 U.S.C. § 50207(d).

The language of N.C. GEN. STAT. § 163-82.7(g)(3) mirrors this requirement, and provides that when voter casts a ballot and subsequently a piece of mail is returned as undeliverable, the person shall be sent a confirmation mailing and if the mailing is not returned, the voter may be removed only if the voter then remains inactive after two federal election cycles, § 163-82.14(d)(2). Thus, the action proposed by Plaintiff would not only violate North Carolina law but would also violate the list maintenance provisions of the NVRA:

> Further, it is a violation of the NVRA to purge voters from the voter rolls without following Section 8's notice provision, which includes giving these voters two federal election cycles to vote or otherwise update their voter registration. 52 U.S.C. § 20507(d)(1). It does not matter whether the returned mailing was sent by a third party or by the County Board. Election officials are required to wait [*31] two federal election cycles following the required notice before removing a voter from the voter rolls. Such a provision operates as a "fail-safe." See *Eaton*, 581 F. Supp. 2d at 1081 ("[A] state cannot prevent a citizen from voting on the ground that the citizen has changed his or her address. This rule is . . . designed to protect the citizen's right to vote for at least two federal election cycles while the citizen updates his or her registration information.").

See *N.C. State Conf. of the NAACP v. N.C. State Board of Elections*, 2016 WL 6581284, at **8 (M.D.N.C. Nov. 4, 2016).

The explicit exemption from the NVRA for states with election-day registration provides further evidence that the statute was designed to encourage same-day registration procedures more permissive than those authorized by North Carolina. Section 4(b)(2) exempts from the NVRA states that allowed same-day registration on Election Day as of August 1, 1994. § 20503(b)(2). Idaho, for example, allows individuals to same-day register on Election Day if the individual fills out a registration application and provides "proof of residence."[1] Idaho Gen. Stat. § 34-408A. Individuals who register to vote at a time other than on Election Day are required to mail their voter registration applications at least twenty-five days prior to the election and are subject to mail verification. *Id.* § 34-410. Same-day registrants, in contrast, could not complete the mail verification process prior to voting, and yet Idaho is explicitly exempted from having to comply with the NVRA.

## II. PLAINTIFF IS UNLIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION, AND THE EQUITIES WEIGH IN FAVOR OF STATE DEFENDANTS

Plaintiff must make a "'clear showing' of irreparable harm to be suffered by the plaintiff from a denial of the relief must be both 'actual' and 'immediate.'" *Direx Israel, Ltd. v.*

*Breakthrough Medical Corp.* 952 F.2d 802, 812 (4th Cir. 1991) (quoting *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983)). Plaintiff has made no such showing. He does not claim that his vote will not be counted, but only that he will be unquantifiably less enfranchised due to the inclusion of voters who Plaintiff wrongly assumed would be excluded, but for their membership in a "special, preferred class . . . created by the Board's arbitrary action." Doc. No. 43 at 8. He is mistaken: Plaintiff will not be disenfranchised and, far from arbitrary, State Defendants' actions accord with controlling State and Federal law.

Plaintiff's requested injunction will disenfranchise citizens who are qualified to vote under this State's Constitution—a harm of immeasurable magnitude for affected voters and a State still striving to prove its departure from a history marred by an encumbered franchise. By contrast, a denial of the preliminary injunction disenfranchises no one and preserves appropriate lines of separation between North Carolina's democratic system and the federal courts. Thus, the balance of equities weighs heavily in favor of denying a preliminary injunction.

Plaintiff is seeking a mandatory injunction that *disrupts* the status quo. Particularly as to "considerations specific to election cases," the Supreme Court has cautioned that "court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006). Though Plaintiff's motion comes after votes have been cast, a preliminary injunction by this Court would certainly affect elections and may act to discourage future participation by fostering confusion about the process of voting and the security of the ballot once cast.

Mandatory injunctions—which prematurely change the status quo pending the final outcome of litigation—are disfavored. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). Here, the last uncontested status is (1) the Board certifying the

elections on during statewide canvass, which is scheduled for December 9, 2016, and (2) the Board counting votes that were cast by citizens who did not complete the mail-certification process. Thus, the balance of the equities would weigh against granting the preliminary injunction, since to do so would significantly alter the status quo that is the State's ordinary process of certification and tabulation of votes.

## III. THE PUBLIC INTEREST WEIGHS HEAVILY AGAINST AN INJUNCTION.

The public interest also favors a denial of a preliminary injunction in recognition of the paramount need to certify the election and seat those chosen by the people of North Carolina:

> [U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief . . . . In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles. With respect to the timing of relief, a court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes that could make unreasonable or embarrassing demands on a State in adjusting to the requirements of the court's decree.

*Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (emphasis added). This sentiment was echoed four decades later in *Purcell v. Gonzalez*, 549 U.S. 1 (2006). Plaintiff's request would "act to bar the State Board from certifying until the Board can attest all voters are being treated equally by the inclusion of only verified voters in final counts," Doc. No. 43 at 9, a vague and indefinite request that would trigger ill effects across the system of government in North Carolina. A stay would delay the issuance of certificates of election necessary for candidates to take office as elected officials as required by the North Carolina Constitution.[5] And should the State Board fail to certify

---

[5] State senators, representatives, and council of state members commence office on the first day of January. N.C. CONST. art. II, § 9, Art. III, §§ 2 and 7. The terms of Justices of the Supreme Court, Judges of the Court of Appeals, and Judges of the Superior Court "shall hold office for terms of eight years and until their successors are elected and qualified." N.C. CONST. art. IV, § 16.

the results of the election by the "safe harbor" date of December 13, 2016, North Carolina fail to meets its obligation to furnish presidential electors under the U.S. Constitution. *See* U.S. CONST., art III, § 1, cl. 2. *See generally Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J. concurring).

The Court should consider recent findings regarding the use of SDR processes across the state in weighing the balance of equities in this case. *See e.g. League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) and *McCrory*, 831 F.3d 204.

## **CONCLUSION**

For the foregoing reasons, the State of North Carolina request the Court to deny Plaintiff's motion for a preliminary injunction.

This the 5th day of December, 2016.

/s/ Joshua Lawson
Joshua Leo Lloyd Lawson
N.C. State Board of Elections
PO Box 27255
Raleigh, NC  27611-7255
(919) 715-9194
Fax 919-715-0185
Legal.Team@ncsbe.gov
State Bar No. 45463
*Attorney for State Defendants*

Katelyn Rose Love
N.C. State Board of Elections
PO Box 27255
Raleigh, NC  27611-7255
(919) 715-8506
Fax 919-715-0185
Legal.Team@ncsbe.gov
State Bar No. 48744
*Attorney for State Defendants*

22

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on this day I filed the foregoing **Response to Plaintiff's Motion for Preliminary Injunction** with the clerk's office via the CM/ECF system, which will send notification of filing to the following counsel of record:

Karl S. Bowers, Jr.
P.O. Box 50549
Columbia, SC 29250

Joshua Brian Howard
115 ½ West Morgan Street
Raleigh, NC 27601

Allison J. Riggs
Anita S. Earls
Emily E. Seawell
1415 West Highway 54, Suite 101
Durham, NC 27707

Caitlin Anne Swain-McSurely
Leah J. Kang
400 W. Main Street, Suite 203
Durham, NC 27701

Irving L. Joyner
P.O. Box 374
Cary, NC 27512

Martha A. Geer
150 Fayetteville St., Suite 980
Raleigh, NC 27601

Penda D. Hair
1401 New York Avenue, Suite 1225
Washington, DC 20005

This the 5th Day of December, 2016.

<u>/s/ Katelyn Love</u>
Katelyn Rose Love
*Attorney for State Defendants*
*N.C. State Board of Elections*
*Strach, Whitney, Amoroso,*
*Malcolm, Baker & Kricker*